The RHODE ISLAND REPUBLICAN
PARTY et al.

v.

John A. DALUZ, in his official
capacity as Chair of the State
Board of Elections et al.

No. 2007–220–Appeal.

Supreme Court of Rhode Island.

Dec. 18, 2008.

James Bopp, Jr., Pro Hac Vice, Terre Haute, IN, Bernard A. Jackvony, Providence, Stephen Izzi, Alan Gelfuso, for Plaintiffs.

H. Reed Witherby, Pro Hac Vice, Boston, MA, Raymond H. Marcaccio, for Defendants.

Present: WILLIAMS, C.J., GOLDBERG, SUTTELL, and ROBINSON, JJ.

## O P I N I O N

Justice GOLDBERG, for the Court.

This case came before the Supreme Court on September 30, 2008, on appeal by John A. Daluz, in his official capacity as chair of the State Board of Elections (board); Frank J. Rego, in his official capacity as vice-chair of the board; Florence G. Gormley and Raymond A. Xavier, in their official capacities as commissioners of the board (collectively defendants).[1] The

1. When this action originally was filed in the Superior Court, it was titled as an action

defendants are appealing from a Superior Court order that permanently enjoined the board from investigating alleged violations of Rhode Island's campaign finance law by the Rhode Island Republican Party (Republican Party) and the Donald L. Carcieri Campaign for Governor (campaign and collectively plaintiffs) with regard to a television advertisement that was broadcast in October 2002.[2]

## Facts and Travel

In October 2002, the Republican Party paid for a thirty-second television advertisement that appeared on several local stations. It is this political advertisement that is the subject of this dispute.[3] On October 18, 2002, William Lynch (Lynch), chairman of the Rhode Island Democratic Party (Democratic Party), submitted a letter to the board alleging that the advertisement violated Rhode Island's campaign contributions and expenditures statutes. The board met on October 21, 2002, to hear from the Democratic Party, the Republican Party, and the campaign with respect to Lynch's complaint. Both the Republican Party and the campaign agreed that the hearing should take place in an open session.

During that session, Lynch argued that the advertisement was, in fact, a commercial for the campaign and that it was paid for with approximately $250,000 from the Republican National Committee (RNC) in

---

against: then-chairman of the board, Roger N. Begin (Begin); then-vice-chairman of the board, Thomas V. Iannitti; and then-commissioners John A. Daluz, Florence G. Gormley, Frank J. Rego, and Raymond A. Xavier. All these people were sued in their official capacities.

On March 17, 2008, the board filed a notice of substitution of parties with this Court to reflect the transition to the current board, the members of which are listed as defendant-appellants above. Accordingly, these elected officials have been substituted in their official capacities. *See Parella v. Montalbano*, 899 A.2d 1226, 1230 n. 1 (R.I.2006).

**2.** We note that there are two orders included in the Superior Court record. The trial justice entered an order on April 25, 2006 (first order). Apparently, the parties did not agree on the language in that order; and a second, modified order was entered on May 15, 2006 (second order). The motion to strike entry of the first order was filed on July 3, 2006, and granted on August 18, 2006. The appeal to this Court was filed on May 26, 2006.

**3.** An electronic copy of the advertisement is included in the record in this case. The opening scene of the advertisement focuses on an image of the Rhode Island State House, accompanied by the written words "insider deals," "scandal," and "corruption," as the narrator states: "Insider deals. Corruption. State spending out of control." The following image is a still picture of then-Speaker of the Rhode Island House of Representatives John Harwood, displayed with the phrase "The Harwood Scandal," and a quotation attributed to the "Providence Journal, 10/12/02," mentioning "a tangle of accusations and denials." The narration continues: "And political boss John Harwood embarrassing us all. We need to clean up the mess and stop wasteful spending." The picture of John Harwood subsequently is replaced with video clips of Donald L. Carcieri (Carcieri), who was the Republican candidate for Governor in the 2002 election, with the name "Don Carcieri" written below his image. Accompanying the video is a narration that states: "Don Carcieri believes that too. He's taking on Speaker Harwood and backing a big audit. Find government waste and stop it. End corruption. Root out waste. Say no to tax increases. That's what Carcieri believes." Next appearing are video clips declaring that "Carcieri called for Harwood to resign;" "an audit of state government;" and "cut wasteful spending." Each of these phrases is attributed to the Providence Journal. The phrase "No tax increases" also appears in writing. The narrator's last statement is "Learn more about Don Carcieri's fresh start for Rhode Island," and the text on the screen is "Learn more," "Don Carcieri's Plan," "Log on: www.Stop WastefulSpending.com," and "Paid for by the Rhode Island Republican Party."

violation of G.L. 1956 § 17–25–10.1.[4] The board viewed the advertisement and Lynch produced printed copies of the content of the website featured at the end of the advertisement. The website advocated support for Donald L. Carcieri (Carcieri) for Governor. When questioned by the board about who paid for the advertisement, the campaign stated that it was not paid for by the campaign and that the campaign was uncertain about the source of the money. The Republican Party then explained that it had paid for the advertisement with money that the RNC had transferred to an account of the Republican Party designated for federal money.

The Republican Party presented the board with two independent arguments for dismissing the complaint. First, it argued that Rhode Island's campaign finance restrictions would not apply to the advertisement absent coordination between the Republican Party and the campaign and that such coordination did not occur. Second, the Republican Party argued that the advertisement was exempt from Rhode Island's campaign finance restrictions because it was a general-issue advertisement for party building purposes rather than an advertisement for any particular candidate.

After hearing from the parties, the board found that the advertisement constituted express advocacy for the campaign in violation of § 17–25–10.1 and ordered the Republican Party to stop airing it.[5] The Republican Party complied with the cease-and-desist order, stopped the advertisement, and the race for Governor continued unabated; Carcieri was elected Governor on November 5, 2002. He was reelected in 2006 for a second and final four-year term [6] and currently is the Governor of the State of Rhode Island.

On November 5, 2002, the Republican Party filed a petition for a writ of certiorari with this Court seeking dismissal of the proceedings before the board based on federal preemption. This Court denied the petition on June 18, 2003. During the next year and a half, the board made several attempts to conduct discovery, but these efforts were unsuccessful. On April 26, 2005, more than two years after the election campaign, the board appointed attorney H. Reed Witherby as special counsel (Witherby or special counsel) to review the dispute and prepare a report. On October 7, 2005, special counsel filed a report (report) in which he analyzed the legal issues and made recommendations for further action by the board.

4. The campaign objected to proceeding in the absence of a verified complaint based on actual knowledge and argued that Lynch had no evidence to support his allegations. Begin announced that the board would review the matter on its own initiative under G.L. 1956 § 17–25–5(a)(7)(i), which permits the board to "[c]onduct confidential investigations and/or closed hearings in accordance with this title relative to alleged violations of this chapter either on its own initiative or upon receipt of a verified written complaint * * *." Although the Republican Party also contended that the board had not provided proper notice of the hearings, Begin rejected that argument, noting that the parties were on actual notice of the proceedings and the bases of Lynch's complaint.

5. The board adopted a motion stating: "[T]he advertisement that has been viewed today * * * constitutes an express advocacy of the Don Carcieri Campaign for Governor by the State of Rhode Island Republican Party and is a violation of [G.L. 1956 § ]17–25–10.1. Further, * * * the Respondent, the Rhode Island Republican Party, shall cease and desist any further running of this advertisement."

6. See R.I. Const. art. 4, sec. 1 ("No person shall serve consecutively in the same general office for more than two (2) full terms * * *.").

Witherby rejected the Republican Party's contention that the First Amendment prohibited Rhode Island's campaign finance restrictions; he also rejected the contention that the statute was preempted by federal law. Additionally, special counsel noted that a separate violation occurred when the RNC transferred the money to the Republican Party, in contravention of the statute's "restrictions on the sources (§ 17–25–10.1(j)) and/or amounts (§ 17–25–10.1(a)) of contributions that the [Republican] Party may lawfully receive for state election activity." He recommended that the board refer this campaign contribution violation to the Rhode Island Attorney General for a civil enforcement action against the Republican Party. This did not occur.

Further, in light of his conclusion "that Rhode Island may lawfully limit the amount of the [Republican] Party's expenditure on the [a]dvertisement if it was coordinated with the Carcieri [c]ampaign," special counsel recommended that the board pursue a second course of action with respect to this campaign-expenditure violation. Specifically, Witherby recommended that the board undertake a factual inquiry to determine "whether or not there was, in fact, such coordination under § 17–25–10.1(c) and a resulting violation of § 17–25–10.1(e)." On October 26, 2005, some three years after the advertisement was removed from television, the board voted to accept the report and authorized special counsel to conduct an investigation, to be concluded no later than January 31, 2006. Significantly, because of this inexplicably long delay, the period of limitations for any criminal prosecution already

was at death's door. *See* G.L. 1956 § 12–12–17(c). We have not been provided with an explanation for the astonishingly long delay.

On November 9, 2005, three years after the election, the board issued subpoenas *duces tecum* to the respective Keeper of the Records for the Republican Party and for the campaign. The subpoenas sought production of documents that were related to the advertisement and that were generated during the three months preceding the 2002 election; the subpoenas had a return date of March 24, 2006.[7] Attached to each subpoena was a copy of an Investigation Protocol developed by special counsel to provide the procedural guidelines governing the investigation.[8] On February 7, 2006, the board heard and denied motions from the Republican Party and the campaign to quash the subpoenas and stay the investigation.

On March 8, 2006, the Republican Party and the campaign filed the present action in the Superior Court seeking declaratory and injunctive relief. The plaintiffs sought a declaration (1) that the advertisement and related transfer of money preemptively are regulated by federal law and (2) that the board's actions denied plaintiffs due process. On March 17, 2006, plaintiffs also filed motions seeking a preliminary injunction to prevent the board from proceeding with the case and a stay of further proceedings pending a judicial determination of its claims.

On March 27, 2006, the board filed its objections, and the parties appeared before the trial justice. The trial justice explained that he perceived the case to

---

7. We note that, although the board had directed that the investigation be concluded by January 31, 2006, the return date for the subpoenas was nearly two months after that deadline. We have been provided with no explanation for this disparity.

8. However, it should be noted that at that time the board had not formally adopted the Investigation Protocol.

have two parts: first, whether the investigatory process violated plaintiffs' due-process rights, and, second, whether the substantive law violated plaintiffs' First Amendment rights. The trial justice first entertained the due-process argument, and he focused on whether the board's purported failure to promulgate rules governing its investigations violated due process. The Republican Party and the campaign argued that the failure of the board to adopt rules distinguishing its investigatory authority from its adjudicatory power amounted to a denial of due process. Additionally, plaintiffs argued that there were no procedural rules in place to protect their due-process rights during an investigation.

The board responded that the procedural requirements of due process vary depending on whether an administrative agency is conducting an investigation or an adjudication. According to the board, no adjudicative proceedings would take place until the investigation was completed, and then only if it was determined that a violation was committed and an adjudication was warranted. The board asserted that if it decided to commence adjudicative proceedings, full due-process protections would be afforded to the Republican Party and the campaign.

The parties also argued about the substantive requirements of the campaign finance law at issue—namely, whether a political advertisement must contain express advocacy for a particular candidate for Rhode Island law to apply to the source of the money for the advertisement.

However, the trial justice declined to consider that argument in his decision.

There was no testimony presented in the Superior Court. At the conclusion of the hearing, and over the objection of the board, the trial justice announced that he would exercise his authority under Rule 65(a)(2) of the Superior Court Rules of Civil Procedure to consolidate the preliminary-injunction hearing with a trial on the merits. He issued a bench decision that afternoon.

In his decision, the trial justice permanently enjoined the board from any further investigation with respect to the advertisement. He concluded that the Superior Court had jurisdiction to consider the dispute under G.L. 1956 § 9–30–1, the Uniform Declaratory Judgments Act (UDJA). In light of the First Amendment rights implicated in an election, the trial justice declared that the board's failure to establish rules governing its proceedings amounted to a denial of due process to the Republican Party and the campaign. The trial justice found that the statutory provision that "authorized and empowered [the board] to * * * [a]dopt rules and regulations to carry out the purposes of this chapter," § 17–25–5(a)(3), was not discretionary, but mandatory. He based this holding solely on this Court's 1948 decision in *Nolan v. Representative Council of Newport*, 73 R.I. 498, 505, 57 A.2d 730, 734 (1948), in which we noted that "powers given to public functionaries or others for public purposes or the public benefit, are always to be exercised when the occasion arises."[9]

9. In *Nolan v. Representative Council of Newport*, 73 R.I. 498, 499, 57 A.2d 730, 731 (1948), this Court examined language in the charter of the city of Newport that stated: " 'In case of vacancy in the office of mayor * * * the representative council *may* call a special election to fill the vacancy.' " (Emphasis added.). This Court determined that the word "may" did not vest the council with discretionary power to decline to call a special election upon the death of the mayor because such a construction would "not only deny to the people the right to vote for mayor but would also leave the city without anyone

The record discloses that the board, in defending against the allegation that it failed to adopt rules of procedure and rules for its investigations, produced copies of (1) its publication entitled "Guide to the Rhode Island Campaign Contributions & Expenditures Reporting Act (R.I.G.L. § 17–25)" (guide); (2) the Investigation Protocol prepared by special counsel; and (3) the Rules of Practice and Procedure in Adjudicatory Hearings Before the Rhode Island Board of Elections (rules).[10] Unimpressed, the trial justice declared that the guide was "an absolutely inadequate rule or guideline or publication designed to foster the implementation of the statute enacted by the [L]egislature." The trial justice also faulted the board for not formally adopting the Investigation Protocol and for waiting until less than a month before the hearing in the Superior Court before enacting the rules. The trial justice found that "[t]he absence of rules in this case, or even at times the disregard of the clear mandate of the statute, show that * * * plaintiffs are not speaking with any exaggeration when they say that they are being burdened and harassed by the regime under which they find themselves or have found themselves since October of 2002." Although the trial justice considered the subpoenas that the board issued "burdensome, oppressive[,] and overly broad," the order that was issued did not accurately reflect these findings.

An order was entered on May 15, 2006, that declared that the board "has not adopted procedural rules governing its investigations of possible violations of the campaign finance laws or published materials to give notice of the requirements of the law" and that the failure to enact such rules would result in a violation of plaintiffs' due-process rights. The order also permanently enjoined the board from "pursuing any further investigation" of the Republican Party and the campaign concerning the October 2002 advertisement. The board filed a notice of appeal on May 26, 2006.

Before this Court, the board argues that the Superior Court's conclusion that it was vested with subject-matter jurisdiction to issue declaratory and injunctive relief was erroneous. The board also contends that the trial justice erred when he found that the board was required to promulgate rules governing its procedures for investigations and adjudications and that its failure to do so would violate plaintiffs' due-process rights. Finally, the board assigns error to the holding that the due-process rights of the Republican Party and the campaign would be violated if the investigation proceeded because there had been insufficient notice of the requirements of the law.

## Standard of Review

 It is well settled that a justice of the Superior Court has discretion to grant or deny declaratory relief under the UDJA. *Sullivan v. Chafee,* 703 A.2d 748, 751 (R.I.1997) (citing *Woonsocket Teachers' Guild Local Union 951, AFT v. Woonsocket School Committee,* 694 A.2d 727, 729 (R.I.1997), and *Lombardi v. Goodyear Loan Co.,* 549 A.2d 1025, 1027 (R.I.1988)). However, the discretion granted to the trial justice "is not absolute and is subject to appropriate appellate review." *Id.* (citing *State v. Cianci,* 496 A.2d 139, 146 (R.I.1985)). The decision of the trial jus-

who could lawfully exercise the special powers of mayor under the charter." *Id.* at 506, 57 A.2d at 735. In our view, the holding in *Nolan* is not pertinent to the issues that confront us today.

10. The rules were adopted by the board on March 7, 2006—that is, one day before this action began.

tice will not be disturbed on appeal unless there was an abuse of discretion or the decision clearly was erroneous. *Id.* (citing *Woonsocket School Committee*, 694 A.2d at 729). Accordingly, this Court reviews a declaratory judgment to determine "whether the court abused its discretion, misinterpreted the applicable law, overlooked material facts, or otherwise exceeded its authority." *Id.*

▮ Upon review of a trial justice's decision to grant or deny a permanent injunction, this Court will overturn the findings of fact made by the trial justice only when the trial justice clearly is wrong or when the trial justice has overlooked or misconceived material evidence. *Providence Teachers' Union Local 958, AFL–CIO, AFT v. City Council of Providence*, 888 A.2d 948, 952 (R.I.2005) (citing *Retirement Board of the Employees' Retirement System of Providence v. City Council of Providence*, 660 A.2d 721, 724 (R.I.1995)). "Questions of law, however, are reviewed *de novo.*" *Id.* (citing *Rhode Island Depositors Economic Protection Corp. v. Bowen Court Associates*, 763 A.2d 1005, 1007 (R.I. 2001)).

### Jurisdiction

Before we begin our analysis of the issues before the Court, the basis of the Superior Court's jurisdiction must be at the forefront of our consideration. In their complaint, plaintiffs alleged that the Superior Court had jurisdiction to review the case because the Administrative Procedures Act (APA) provided the court with jurisdiction to review "[a]ny preliminary,

procedural, or intermediate agency act or ruling" in circumstances in which "review of the final agency order would not provide an adequate remedy." G.L. 1956 § 42–35–15(a). The board responded that it is exempt from the APA[11] and that judicial challenges to final decisions of the board are reviewed by this Court upon grant of a petition for a writ of certiorari. *See Van Daam v. DiPrete*, 560 A.2d 953, 954 (R.I. 1989).

Although the trial justice made passing reference to § 42–35–7,[12] he did not base his jurisdictional conclusions on the APA. Instead, the trial justice concluded that the source of the Superior Court's jurisdiction was the UDJA. We agree. Nevertheless, we deem it necessary to clarify the relationship between the APA and the board.

▮ The provisions of the APA explicitly limit its reach, and G.L. 1956 chapter 7 of title 17, entitled "State Board of Elections," is textually excluded from the APA's ambit. Section 42–35–18(b)(7). Critically and determinatively for our purposes, chapter 7 of title 17 vests the board with the power to conduct investigations, summon witnesses, and administer oaths "in all cases of every nature pending before it." Section 17–7–8. The genesis of this dispute was a challenge to the authority of the board to *investigate* alleged campaign finance violations. Even when investigating an alleged violation of chapter 25 of title 17, the board's powers derive from § 17–7–8 and therefore explicitly are exempt from the APA. Thus, plaintiffs' argument that the APA governs any ac-

---

**11.** The board cited G.L. 1956 § 42–35–18(b)(22) as the source of the exemption, but the 2007 Reenactment lists the exemption in § 42–35–18(b)(7).

**12.** Section 42–35–7 states in pertinent part: "The validity or applicability of any rule may be determined in an action for declara-

tory judgment in the [S]uperior [C]ourt of Providence County, when it is alleged that the rule, or its threatened application, interferes with or impairs, or threatens to interfere with or impair, the legal rights or privileges of the plaintiff."

tions taken by the board in relation to chapter 25 of title 17, including the present investigation of campaign contributions and expenditures, is unavailing. We are of the opinion that the APA has no place in this case.

■ Nevertheless, we are equally satisfied that the Superior Court was vested with jurisdiction to grant or deny declaratory relief pursuant to the UDJA and to grant or deny injunctive relief as a court of general equitable jurisdiction. G.L. 1956 § 8–2–13.

## Analysis

■ We undertake review of this case mindful of the important First Amendment rights impacted by the regulation of elections and the need for clarity about the substantive requirements of Rhode Island's election law. However, this Court repeatedly has declared that it "will not issue advisory opinions or rule on abstract questions." *State v. Lead Industries Association, Inc.*, 898 A.2d 1234, 1238 (R.I. 2006) (quoting *Vose v. Rhode Island Brotherhood of Correctional Officers,* 587 A.2d 913, 915 n. 2 (R.I.1991)). Although the parties have expended considerable energy debating the substantive First Amendment rights implicated in political campaigns, those issues are not before us. The dispute in this case is procedural— under what circumstances may the board undertake an investigation into alleged violations of campaign contributions and expenditures limitations? The trial justice decided that because the board failed to enact procedural rules governing its investigation and failed to publish a manual of the requirements of the statute—a finding that clearly was wrong—the board should be permanently enjoined from proceeding with its investigation, but that it could refer the matter to the Attorney General. The trial justice declined to reach the diffi-

cult First Amendment questions presented in this case. We likewise decline to do so because we will not decide these important constitutional issues "in an intellectual vacuum." *In re Grand Jury Subpoena,* 748 A.2d 821, 826 (R.I.2000). Should these questions "arise in an appropriate factual context," we will be confronted with a factual record in a case that is not so aged and infirm such that there will be sufficient safeguards to ensure full and complete judicial review. *Id.*

Having set forth the jurisprudential limitations that constrain us, we are satisfied that the trial justice's decision clearly was erroneous. The trial justice found that the board failed to adopt rules governing its investigations as required by statute and that the board failed to publish materials giving notice of the requirements of the state's election laws. In each of these findings, the trial justice overlooked or misconceived material evidence and clearly was wrong. We shall address these findings *seriatim.*

■ The trial justice's decision in this case rests on the incorrect premise that, before it may exercise its investigatory authority, the board was required to adopt rules governing its investigation. We know of no decision of this Court declaring that the procedural protections that arise in adjudicatory proceedings must be afforded during agency investigations, and we decline to so hold today.

■ This Court has acknowledged that "the appropriate resolution of investigatory, inquisitorial, and adjudicative roles in a single administrative body has been one of the most problematic features of state and federal administrative law." *La Petite Auberge, Inc. v. Rhode Island Commission for Human Rights,* 419 A.2d 274, 284 (R.I. 1980) (citing *Withrow v. Larkin,* 421 U.S. 35, 51, 95 S.Ct. 1456, 43 L.Ed.2d 712

(1975)). The United States Supreme Court has noted that, although administrative regulatory agencies "normally make determinations of a quasi-judicial nature, they also frequently conduct purely fact-finding investigations." *Hannah v. Larche,* 363 U.S. 420, 445, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960). When an agency is conducting a non-adjudicative, fact-finding investigation, notice, confrontation, and cross-examination considerations are not appropriate. *Id.* at 445–46, 80 S.Ct. 1502. The Supreme Court has recognized the legitimate interest of preventing "the sterilization of investigations by burdening them with trial-like procedures." *Id.* at 448, 80 S.Ct. 1502.

The General Assembly has imbued the board with investigatory authority "in all cases of every nature pending before it," § 17–7–8, and in doing so the board may summon witnesses to testify under oath, "in the same manner as witnesses are compelled to appear and testify in any court," and may compel the production of documents. *Id.* Even a cursory reading of this grant of investigatory power leads to the conclusion that procedural rules are not a condition precedent to an investigation. Accordingly, we are satisfied that there is no basis in law for the trial justice's conclusion that the board was required to adopt procedural rules before it might exercise its statutory authority. However, as will be discussed hereinafter, the adjudicatory authority of the board is strictly limited and not final.

Next, we consider the trial justice's finding that the board failed to give notice of the statute's campaign finance requirements. Section 17–25–5.1 requires the board to "prepare and publish a manual prescribing the requirements of the law." The board did so. The guide was introduced as an exhibit at the hearing and sets forth the requirements of the statute.

Although the trial justice announced in his bench decision that the guide was "absolutely inadequate," he failed to set forth his reasons for this sweeping finding; and, in the order issued in this case, the trial justice declared that the board did not publish any "materials to give notice of the requirements of the law." The trial justice overlooked and misconstrued the evidence before him and clearly erred in his findings. Because the findings of the trial justice clearly were wrong it was error to permanently enjoin the board from pursuing an investigation.

However, although we are satisfied that the findings of the trial justice were erroneous, we are mindful that if this investigation proceeds, this Court would be required to address the remaining First Amendment issues that the parties raised. Based on the age of this case and the truly *de minimis* remedy that has survived the passage of time, we decline to do so.

### What Remedy?

After a careful review of the record before us, we are of the opinion that if the board concludes that either party violated the state's election laws, the remaining remedies available to the board at this late date are so insignificant and of such minimal import as to warrant the dismissal of this case in its entirety. The alleged violations at issue in this case are governed by chapter 25 of title 17, which is entitled "Rhode Island Campaign Contributions and Expenditures Reporting Act." Although not a model of clarity, this act encompasses two separate and distinct areas of Rhode Island's election law, important distinctions that have been blurred by the board in this case. The first part is set forth in §§ 17–25–1 through 17–25–17. These provisions contain the limits and reporting requirements for political contributions and expenditures for both candi-

dates and donors; they also set forth potential penalties for any violations.[13] The second part of chapter 25, §§ 17–25–18 through 17–25–30.1, implements and regulates public financing of election campaigns.[14]

The statutory authority of the board over alleged violations of the campaign contributions and expenditures provisions and the public financing provisions is different. With respect to alleged violations of the contribution and expenditures provisions, § 17–25–13(a) provides that "[a]ny person who willfully and knowingly violates the provisions of this chapter shall, upon conviction, be guilty of a misdemeanor and shall be fined not more than one thousand dollars ($1,000) per violation." General Laws 1956 § 12–12–17(c) sets the statute of limitations for a misdemeanor at three years, a period that expired long ago. However, "[t]he fact that one remedy * * * may have been rendered moot does not affect the viability of the case or the remaining remedies." *Tanner v. Town Council of East Greenwich,* 880 A.2d 784, 794–95 (R.I.2005). Section 17–25–13(b) allows the board independently to impose a fine of up to $100 for each violation of the provisions of chapter 25 of title 17. Thus,

whether the advertisement constitutes a single offense or a separate violation for each of the few times that it was aired, the available remedy is *de minimis.*

There is much wisdom in the ancient maxim, "*de minimis non curat lex.*" (The law does not concern itself with trifles.). In view of what little remains at stake in this case and the negligible impact a decision would have on the parties, it would be jurisprudentially unwise for us to venture into the thicket of constitutional interpretation and statutory construction that surrounded this case when it was in its infancy. The advertisement at issue was aired for only six days, and the Republican Party immediately complied with the cease-and-desist order, raising the question whether any sanction is appropriate.

The board's remaining remedy,[15] under § 17–25–16(a), permits referral of alleged violations to the Attorney General for civil enforcement.[16] It has been six years since the advertisement aired and the board has not referred this matter to the Attorney General for any type of action, civil or criminal. The board failed to act on the special counsel's recommendation to refer to the Attorney General the alleged cam-

**13.** Section 17–25–2 states: "It is declared to be in the public interest and to be the policy of the state to require the reporting of certain contributions received and expenditures made to aid or promote the nomination, election, or defeat of all candidates for public office."

**14.** Section 17–25–18 explains that because of the dramatic increase in the cost of running for election, there is a greater risk of qualified candidates being unable to run and a greater risk of improper influence over candidates by donors. Accordingly, the General Assembly determined "that it is in the best interest of the citizens of the state to provide public financing to qualified candidates for general office." *Id.*

**15.** Although the board suggests that it may impose a civil fine in accordance with § 17–25–28, that section is limited to public finance

violations and is of no moment to the issues before the Court.

**16.** Section 17–25–16(a) empowers the board to "request the [A]ttorney [G]eneral to bring an action in the name of the [S]tate of Rhode Island in the [S]uperior [C]ourt against the person and/or committee to enjoin them from continuing the violation, or doing any acts in furtherance of the violation, and for any other relief that the court deems appropriate." Obviously, any action seeking forbearance by plaintiffs would be a nullity—the Republican Party campaign complied long ago with the board's cease-and-desist order. It is also unlikely that there would be any other appropriate relief available.

paign contribution violation, notwithstanding the fact that the trial justice's order specifically permitted the board to transfer any documents or information in its possession to the Attorney General.[17]

 In light of this exceptional context and the painful travel of this controversy, this case no longer presents a sufficiently genuine case or controversy to warrant further review, and it is our judgment that it should therefore be dismissed. To remand this aged case to the board for further proceedings would require this Court to decide the constitutional issues raised by the parties. We would have to wade into an ocean of First Amendment law that has become even more voluminous and complex since the events that gave rise to this case first occurred. *See, e.g., Federal Election Commission v. Wisconsin Right to Life, Inc.,* —— U.S. ——, 127 S.Ct. 2652, 168 L.Ed.2d 329 (2007); *McConnell v. Federal Election Commission,* 540 U.S. 93, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003). In light of the little that remains at stake in this case and the negligible impact (if any) that a decision would have on the parties, we decline to embark on such a journey of constitutional adjudication. *See Spector Motor Service, Inc. v. McLaughlin,* 323 U.S. 101, 105, 65 S.Ct. 152, 89 L.Ed. 101 (1944) (Frankfurter, J.) ("If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality * * * unless such adjudication is unavoidable."); *see also Elk Grove Unified School District v. Newdow,* 542 U.S. 1, 11, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004) (Stevens, J.) ("Always we must balance 'the heavy obli-

gation to exercise jurisdiction,' * * * against the 'deeply rooted' commitment not to pass on questions of constitutionality unless adjudication of the constitutional issue is necessary * * *."); *Lead Industries Association, Inc.,* 898 A.2d at 1237–39 (discussing this Court's policy of declining to address constitutional questions unless strictly necessary).

We are keenly aware of the grave constitutional ramifications of governmental regulation of political campaigns and the financing of such campaigns. It is not out of timidity that we today decline to opine substantively in that domain; rather, we decline to do so because the instant case has become palpably insubstantial. Although there are occasions when constitutional adjudication is appropriate even where what is at stake for the parties is not of great significance, this is not such an occasion. Here, for reasons that the record does not indicate, the arsenal of remedies that once theoretically was available to the board has, by virtue of the passage of time, shrunk to insignificance; it is for this reason that we decline to opine with respect to the weighty constitutional issues that a case such as this implicates.

## Conclusion

The advertisement that is at the heart of this dispute was aired for several days in October 2002. Six years later, the potential for a satisfactory resolution has long since passed; the stake that each party has in the dispute has declined to virtual insignificance—leading us to wonder, what is left? The answer is nothing. Accord-

---

**17.** When asked at oral argument to explain this lapse, the board responded that it interpreted the order to enjoin *any* further action on the case. However, the plain language of the order does not support this reading. The order, presented by the board, enjoined the board from "pursuing any further investigation," but specifically permitted the board to transfer documents and information to the Attorney General. The board's reliance on the order to justify its failure to refer the dispute to the Attorney General is unavailing.

ingly, "we invoke our inherent power to 'fashion an appropriate remedy that would serve the ends of justice.'" *Arena v. City of Providence,* 919 A.2d 379, 396 (R.I.2007) (quoting *Blue Cross & Blue Shield of Rhode Island v. Najarian,* 911 A.2d 706, 711 n. 5 (R.I.2006)). In light of the record before us, justice requires that we dismiss this unending saga and assign this election to its place in history.

For the reasons set forth in this opinion, we vacate the judgment and remand this case to the Superior Court with directions to enter a judgment of dismissal.

Justice FLAHERTY did not participate.