May 25, 2022

**Supreme Court**

Albert A. Faella et al.          :

      v.          :          No. 2019-445-Appeal.
          (PB 10-311)

Town of Johnston et al.          :


Alan Ross          :

      v.          :          No. 2019-447-Appeal.
          (PB 10-60)

Town of Johnston.          :

NOTICE:   This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Albert A. Faella et al.          :

v.          :          No. 2019-445-Appeal.
(PB 10-311)

Town of Johnston et al.          :


Alan Ross          :

v.          :          No. 2019-447-Appeal.
(PB 10-60)

Town of Johnston.          :


Present:  Suttell, C.J., Goldberg, Robinson, and Long, JJ.

## O P I N I O N

**Justice Long, for the Court.**  In these consolidated appeals arising from two consolidated Superior Court civil actions, the defendants, the Town of Johnston and Joseph Chiodo, in his capacity as finance director for the Town of Johnston (defendants or the town), appeal from a judgment of the Superior Court granting declaratory judgment in favor of the plaintiffs, Andrea DiMaio, as duly appointed Administratrix of the Estate of John DiMaio (Mr. DiMaio); Alan Ross (Mr. Ross);

- 1 -

and Albert Faella (Mr. Faella) (collectively plaintiffs).[1] The trial justice determined that certain accounts bearing the names of the respective plaintiffs constituted deferred compensation, governed by Internal Revenue Code § 457; declared the accounts to be the plaintiffs' property; and ordered the associated funds be remitted to the plaintiffs. For the reasons stated herein, we reverse the judgment of the Superior Court and remand these consolidated cases for entry of final judgment consistent with this opinion.

A summary of the facts relevant to these appeals follows, and additional facts are included in the discussion of the issues on appeal.

## Facts and Procedural History

This case stems from a long-running dispute between plaintiffs and the Town of Johnston regarding the entitlement to funds in accounts held first by Aetna Life Insurance and Annuity Company and then by ING Life Insurance and Annuity Company (ING)[2] on behalf of the town (the funds). The facts of this case may be familiar to the reader; these cases were previously before this Court in *Faella v.*

---

[1] The original complaint in PB 10-311 was brought by plaintiffs Albert Faella and John DiMaio. John DiMaio passed away during the pendency of this case, and Andrea DiMaio, in her capacity as administratrix of his estate, was substituted as plaintiff. For the sake of clarity, we at times refer in this opinion to John DiMaio as plaintiff.

[2] Aetna Life Insurance and Annuity Company (Aetna) was ING's predecessor-in-interest with respect to the agreement at issue in this appeal. For purposes of clarity, we refer primarily to ING except where it is necessary to refer to Aetna.

*Chiodo*, 111 A.3d 351 (R.I. 2015). In those consolidated appeals, this Court vacated the trial justice's grant of summary judgment in favor of plaintiffs pursuant to a 1993 contract entitled "Town of Johnston Police Department Pension Plan" (the 1993 pension plan). *Faella*, 111 A.3d at 354, 356, 358. Following our opinion in that case, a nonjury trial took place in the Superior Court, and the decision of the trial justice is the subject of the present appeals. The following facts are largely undisputed.

The plaintiffs were police officers employed by the town beginning between 1983 and 1985. During their tenures with the Johnston Police Department, plaintiffs were members of their local chapter of the International Brotherhood of Police Officers, a police union (the local IBPO). Throughout plaintiffs' employment with the police department, the local IBPO negotiated collective bargaining agreements (CBAs) on behalf of union members.

The CBAs governed, among other items, police officers' retirement benefits. The CBAs indicated that the following pension scheme was in effect for officers retiring after July 1, 1979. The CBAs provided for a pension equal to a percentage of an officer's annual salary at the time of retirement or separation from service, for the remainder of the officer's life. The percentage increased with time served on the force. With respect to officers who were injured in the line of duty, the CBAs provided for a disability pension equal to sixty-six and two-thirds percent of the

officer's annual salary at the time of retirement, even if that officer would not have qualified for that rate if the officer retired other than on a disability pension.

Pursuant to these CBA provisions, between 2004 and 2008 plaintiffs began receiving disability pensions after sustaining serious injuries in the line of duty that left them unable to perform their duties as police officers.

While continuing to receive their disability pensions, plaintiffs also sought distribution of funds held by ING that were attributable to their contributions and the town's matching contributions. The plaintiffs maintained that the ING accounts held funds to which they were entitled as part of their retirement package with the town. For their part, defendants disputed that plaintiffs were entitled to distribution of the funds in the accounts because, defendants asserted, the accounts contained contributions from police officers and the town to fund the town's pension obligations under the applicable CBAs. The defendants therefore refused to execute procedures to remit the funds in the ING accounts, giving rise to this controversy.

The plaintiffs filed the instant actions in Superior Court in 2010, seeking declarations that they were entitled to distribution of all amounts contributed to the ING accounts, as well as mandatory injunctive relief to that effect. Originally named as a party, ING subsequently filed a motion to interplead the funds, which the trial

justice granted. ING thereafter deposited the funds into the registry of the court, where the funds remain, and the trial justice dismissed ING from the actions.

As was the case when this Court reviewed the trial justice's grant of summary judgment in 2011, the parties disputed the history and purpose of the ING accounts at trial. *See Faella*, 111 A.3d at 353. As evidence in support of plaintiffs' view of the ING accounts, they introduced and relied upon an agreement executed by ING and the town, effective April 1984, pursuant to which ING created the accounts (the ING agreement). The ING agreement was labeled on its face as the "Johnston Town Hall Deferred Compensation Plan" and identified the contract holder as "Johnston Town Hall." The master application, which was incorporated into the ING agreement, identified the name of the plan as "Town of Johnston Deferred Compensation – Police Officers" and the type of plan as a "457" under the Internal Revenue Code. The ING agreement established two "group contracts," contract number VB 1965 and contract number VB 1966. Each contract created an account, one housing payroll deductions from police officers, and the other housing contributions made by the town (collectively the accounts).

The accounts segregated contributions by social security number, and plaintiffs received quarterly statements tracking contributions. They could also view the accounts using a personal identification number provided by ING, and, at some

point, they were permitted to decide how the individual contributions should be invested.

According to plaintiffs, the ING agreement established a retirement savings program for police officers that was separate and distinct from the police pension plan established under the CBAs; plaintiffs maintained that, under this purported separate retirement savings program, police officers who chose to participate contributed six percent of each of their salaries to the accounts, and the town contributed a twelve-percent match. In support of this assertion, plaintiffs relied upon deposition testimony from Christina Menard, an ING employee who serviced the accounts, wherein she stated that the ING agreement established a § 457 deferred compensation plan.

In addition to relying on the deposition testimony of Ms. Menard, plaintiffs also called as witnesses Dennis Quaranta, the town finance director in 1993; Robert Civetti, a certified public accountant whose company provided auditing for the town from 1994 through 2014; Ronald Capraro Jr., a CitiGroup Global Markets, Inc. investment adviser who was a broker of record for the accounts from about 2006 to 2012; and Vincent Baccari Jr., who was the town clerk from 2007 through the time

of his trial testimony in 2017. Additionally, plaintiffs provided testimony and documentary evidence, such as enrollment forms and account statements.

The plaintiffs also sought relief under, and presented evidence concerning, the 1993 pension plan, which the trial justice initially admitted *de bene*. The 1993 pension plan was ultimately deemed inadmissible at trial, however, and the relationship between the 1993 pension plan, the ING agreement, and the resulting accounts remains opaque as developed in the trial record. The plaintiffs have not taken issue on appeal with the trial justice's ruling on this evidentiary matter.

At the close of plaintiffs' case-in-chief, defendants moved for judgment on partial findings pursuant to Rule 52(c) of the Superior Court Rules of Civil Procedure. After considering the parties' arguments, the trial justice reserved decision on the motion.

In presenting their case-in-chief, defendants did not dispute that plaintiffs contributed six percent of their salaries to the accounts, or that the town contributed a twelve-percent match. Rather, defendants maintained throughout the trial that plaintiffs were not entitled to distribution of the funds held in the ING accounts, arguing that the accounts held mandatory contributions to, and were a funding mechanism for, the town's pension obligations under the CBAs. The defendants further maintained that the CBAs established the pension benefit for all town police

officers, and that it was pursuant to the CBAs that plaintiffs had been receiving a disability pension since the time of their respective retirements.

At the close of trial, defendants renewed their Rule 52(c) motion for judgment on partial findings; the parties agreed to close with posttrial memoranda.

In their posttrial memorandum, plaintiffs narrowed the relief they sought. Because the 1993 pension plan was ultimately deemed inadmissible at trial, plaintiffs withdrew their claims for relief pursuant to that document and relied solely on the ING agreement as establishing entitlement to the funds. The plaintiffs further withdrew their claims for a mandatory injunction with respect to the accounts, conceding that the claim was moot because the funds were held in the court registry and therefore an injunction was not necessary to distribute the funds if declaratory judgment was granted in their favor. Thus, plaintiffs ultimately sought only one form of relief: a declaration that plaintiffs were entitled to distribution of the funds pursuant to the ING agreement, an outcome that would include an order to the Clerk of the Court to distribute the funds accordingly.

The trial justice rendered a written decision in favor of plaintiffs in August 2019. The trial justice made findings of fact regarding the ING accounts, the ING agreement governing the accounts, plaintiffs' contributions to the accounts, and the applicable CBAs. The trial justice found that the accounts contained deferred compensation held pursuant to an I.R.C. § 457 deferred compensation plan. The

trial justice awarded plaintiffs distribution of both the employee and employer contributions attributable to each of plaintiffs, as follows:

|  | VB 1965 | VB 1966 |
|---|---|---|
| Albert Faella | $102,400.73 | $176,106.94 |
| John DiMaio | $92,424.09 | $169,768.15 |
| Alan Ross | $97,278.07 | $187,502.74 |

The town timely appealed, and presents the following questions for consideration: (1) whether the trial justice erred by reserving decision on defendants' Rule 52(c) motion at the close of plaintiffs' case-in-chief, and (2) whether the trial justice erred by granting declaratory judgment in favor of Mr. Ross, Mr. Faella, and Mr. DiMaio, and awarding distribution of the funds pursuant to the ING agreement.[3]

### Rule 52(c) Judgment on Partial Findings

The defendants assign error to the decision of the trial justice to reserve judgment on the town's motion for judgment on partial findings at the close of

---

[3] While the trial justice's decision with respect to all plaintiffs was entirely based on the declaratory-judgment counts, the final judgment in PB 10-60 entered in favor of Mr. Ross as to count three of his amended complaint, his request for mandatory injunction. This appears to be consistent with the written decision of the trial justice, which misstates the counts remaining with respect to Mr. Ross. Specifically, the written decision states that Mr. Ross withdrew all counts except that seeking mandatory injunction, while in fact Mr. Ross withdrew all counts except that count seeking declaratory judgment with respect to the ING agreement. When pressed on these inconsistencies at oral argument before this Court, however, counsel for Mr. Ross did not clarify the issue. We deem the references to count three of Mr. Ross's amended complaint to be typographical errors, and we proceed with analyzing the propriety of declaratory judgment in his favor on count one of his amended complaint.

plaintiffs' case-in-chief. Rule 52(c) permits a party in a nonjury case to move for judgment as a matter of law at the close of an opponent's case. *E.g.*, *Hernandez v. JS Pallet Co., Inc.*, 41 A.3d 978, 983 (R.I. 2012). However, the rule is discretionary and specifically provides that "the court *may* decline to render any judgment until the close of all the evidence." Super. R. Civ. P. 52(c) (emphasis added); *see* Robert B. Kent et al., *Rhode Island Civil and Appellate Procedure* § 52:7 (West 2022) ("[T]he court is not obliged to entertain the motion and may defer judgment until the close of all the evidence.") (citing *Shove Insurance, Inc. v. Tenreiro*, 667 A.2d 532, 534 (R.I. 1995) (construing former Super. R. Civ. P. 41(b)(2), the predecessor to Super. R. Civ. P. 52(c))). Accordingly, we summarily reject defendants' first assignment of error and hold that the trial justice did not err by reserving on the town's motion for judgment on partial findings at the close of plaintiffs' case-in-chief.

### Declaratory Judgment

The Uniform Declaratory Judgments Act, chapter 30 of title 9 of the general laws, "vests the Superior Court with the 'power to declare rights, status, and other legal relations whether or not further relief is or could be claimed.'" *N & M Properties, LLC v. Town of West Warwick ex rel. Moore*, 964 A.2d 1141, 1144 (R.I. 2009) (quoting G.L. 1956 § 9-30-1). It is well-settled that the decision to grant or deny declaratory judgment rests within the sound discretion of the trial justice. *E.g.*,

*Town of Barrington v. Williams*, 972 A.2d 603, 608 (R.I. 2009). Nevertheless, this discretion "is not absolute and is subject to appropriate appellate review." *Rhode Island Republican Party v. Daluz*, 961 A.2d 287, 293 (R.I. 2008) (quoting *Sullivan v. Chafee*, 703 A.2d 748, 751 (R.I. 1997)). "[T]his Court reviews a declaratory judgment to determine 'whether the court abused its discretion, misinterpreted the applicable law, overlooked material facts, or otherwise exceeded its authority.'" *Town of Barrington*, 972 A.2d at 608 (quoting *Sullivan*, 703 A.2d at 751).

Moreover, "[i]t is the function of the trial justice to undertake fact-finding and then decide whether declaratory relief is appropriate." *Town of Barrington*, 972 A.2d at 608. This Court accords great weight to the factual findings of a trial justice sitting without a jury. *E.g.*, *Kilmartin v. Barbuto*, 158 A.3d 735, 746 (R.I. 2017). These factual findings are subject to appropriate appellate review, and this Court will disturb the findings if clearly erroneous; the trial justice misconceived or overlooked material evidence; or the decision fails to do substantial justice between the parties. *E.g.*, *McBurney v. Roszkowski*, 875 A.2d 428, 436 (R.I. 2005); *Town of Barrington*, 972 A.2d at 609; *see Rhode Island Republican Party*, 961 A.2d at 294 ("[T]his Court reviews a declaratory judgment to determine 'whether the court abused its discretion, misinterpreted the applicable law, overlooked material facts, or otherwise exceeded its authority.'") (quoting *Sullivan*, 703 A.2d at 751).

The trial justice granted plaintiffs' request for declaratory judgment on the basis of the ING agreement, which had been entered into between ING and the town, finding that "[t]he plan at issue is a § 457 deferred compensation plan" that entitled plaintiffs to immediate distribution of the funds. Based on our thorough review of the record in this case, however, including the trial transcripts, we conclude that (1) plaintiffs failed to satisfy their burden that they were entitled to declaratory judgment on the basis of the ING agreement and (2) the trial justice abused his discretion when he made clearly erroneous findings of fact.

The only exhibit at trial that referred to a § 457 plan was the ING agreement between the town and ING. While giving due deference to the trial justice's findings, this Court cannot find an adequate factual basis for the trial justice's implicit inference that the ING agreement constituted an agreement to defer compensation. *See* 26 C.F.R. § 1.457-2(k) (defining a "plan" for purposes of § 457 as "any agreement or arrangement between an eligible employer and a participant or participants * * * under which the payment of compensation is deferred"). The ING agreement did not contain an agreement between plaintiffs and the town to defer compensation, and there is no indication in the record that plaintiffs ever saw the ING agreement prior to their retirements.

As defendants strenuously argued at trial, the ING agreement between the town and ING was just that—a contract between two entities to establish the

accounts. The ING agreement was not an employment or compensation agreement between plaintiffs and the town, and it did not set out the rights and obligations between the town and police officers in its employ with respect to the funds.

In fact, plaintiffs failed to establish any competent evidence indicating that the town and plaintiffs had an agreement to defer compensation or to establish any other program that entitled plaintiffs to the immediate distribution of the funds. That plaintiffs did not establish an entitlement to the funds—particularly through the ING agreement—is best illustrated by the fact that neither the ING agreement nor any of plaintiffs' other evidence establishes any basis for the six-percent and twelve-percent obligations. That is, the parties do not dispute that plaintiffs contributed six percent of their salaries to the accounts or that the town contributed a twelve-percent match; however, plaintiffs offered no evidence that establishes the town's obligation to make such a contribution, nor did they provide evidentiary support for their assertion that the town established a separate and distinct retirement savings program to which the town contributed.

The plaintiffs' own testimony as to the circumstances surrounding their authorization of the six-percent payroll deductions was equivocal. Mr. Ross testified about and provided enrollment and participation forms, which indicated that he had enrolled in a governmental "deferred compensation plan" pursuant to which he contributed six percent of each paycheck. He testified that he signed the enrollment

form with the understanding that he "would be enrolling in a deferred compensation plan, savings plan, through Aetna[.]" Mr. Ross explained that the basis of his understanding came from a representative of Aetna, who assisted him in authorizing the withholdings. Mr. Ross did not know where the six-percent or twelve-percent figures came from. Mr. Faella testified only that he understood the ING accounts to be an annuity.

Mr. DiMaio's deposition testimony—admitted as a full exhibit by stipulation of the parties—was also equivocal. He testified that he was called to a meeting with an ING representative, that the representative told him the six-percent withholdings were required under his contract, and that eventually he would get a "return" on the contributions. He also testified that, while he knew about a twelve-percent contribution by the town, he understood that to be funding for the police pension plan.

The plaintiffs' reliance on Ms. Menard's deposition testimony is similarly unavailing. In their posttrial memorandum, plaintiffs emphasized that Ms. Menard was an ING employee who had handled the accounts for some time and that she was the person most familiar with the ING agreement and the accounts created pursuant thereto. The plaintiffs highlighted the following exchange during Ms. Menard's deposition testimony:

> "[Question:] And how would you—what is the type of plan that is set up [by virtue of the ING Agreement]?

- 14 -

"[Ms. Menard:] A 457 deferred—governmental deferred compensation plan."

This testimony, though heavily relied upon by plaintiffs, also fails to establish plaintiffs' entitlement to the funds. There is no doubt that the ING agreement was labeled as a "§ 457"; therefore Ms. Menard, an employee of ING—a party to the ING agreement—testified as much. Nevertheless, Ms. Menard testified only to her knowledge of the accounts. She did not testify to the relationship between plaintiffs and the town. For example, Ms. Menard testified that, while the accounts were set up as § 457 accounts on ING's side, any plan documents between employer and employee would supersede the ING agreement. Similarly, Ms. Menard made it clear that ING did not play any intermediary role between plaintiffs and the town. The following exchange is illustrative:

> "[Question:] What about when a triggering event happens? An employee that's a participant in the plan reaches, say, retirement age, a triggering event occurs, who's entitled to those funds upon a triggering event occurring?
>
> "* * *
>
> "[Ms. Menard:] It's—we don't—ING doesn't—we're not interested—we don't care. I mean, it could go—if they tell us to pay it to the town, we pay it to the town. If it's paid to the employee, it's checked off to pay the employee, we pay the employee. If it tells us to pay to another provider, we pay it to the other provider.
>
> "* * *

- 15 -

"ING doesn't track the status of employees because, again, we're only the investment provider."

By contrast, the town produced ample evidence—which was overlooked by the trial justice—that did establish an agreement that governed the various rights and obligations between plaintiffs and the town, including an obligation pursuant to which plaintiffs contributed six percent of each paycheck, and the town contributed a twelve-percent match. The defendants consistently maintained that the CBAs established a pension plan of which plaintiffs were a part and that the ING agreement established an investment vehicle to fund that pension plan. The parties presented as a full exhibit the serially negotiated CBAs, which undisputedly since 1986 had contained language that,

> "[i]f an officer resigns between one (1) and ten (10) years of service on the Johnston Police Department, said police officer may withdraw from the retirement fund *his or her six (6) percent contribution as well as the Town's twelve (12) percent contribution into the fund*, for a total of eighteen (18) percent." (Emphasis added.)

The CBAs were the only documents admitted at trial establishing an agreement governing the various rights and obligations as between plaintiffs and the town. Those CBAs undisputedly stated that the police officers were to contribute six percent of their paychecks to a pension fund, while the town contributed a twelve-percent match. Further, the CBA in effect from 2005 through 2008—the CBA under which both Mr. Faella and Mr. Ross retired—explicitly contained a section entitled

- 16 -

"Pension Contributions," which stated: "For years one (1) through thirty (30), officers shall contribute six percent (6%) of their gross pay * * * ."

The defendants also provided testimony from two former town police officers. They each testified that, during their tenures as police officers, contemporaneous with plaintiffs' service, they contributed six percent of each paycheck to fund police officers' pensions, while the town contributed a twelve-percent match. One officer, David aRusso, also authenticated and testified about a letter he received in August 1984 from then-Mayor Ralph R. aRusso,[4] which stated, in relevant part,

> "On July 13, 1984 a committee including your Union Attorney and President, representing your interest, met with me and Aetna Insurance Co. personnel regarding the Town of Johnston Police Pension Fund. The following items have been cleared up.
>
> "#1 The Town of Johnston is contributing 12% and police personnel are contributing 6% of salary toward funding your pension. This fact is part of your union contract.
>
> "* * *
>
> "#4 Under the new program, if you should decide to terminate your employment with the town before retirement, the entire accumulation of 12% and 6% will be yours.
>
> "* * *
>
> "#5 In order to impliment [sic] the new program, YOU MUST RETURN THE POLICY NOW IN YOUR

---

[4] Mayor aRusso was David aRusso's father.

POSSESSION, so that the funds can be rolled over into the new program."

The defendants also supplied a second communication from Mayor aRusso sent to a second officer—Peter Mancini—which provided identical information.

The plaintiffs have never disputed that they were bound by the applicable CBAs and that at all times relevant hereto have received their pensions promised in said CBAs.[5] They did not submit any evidence that they had made an additional, separate contribution of six percent of their salaries to a different fund. Nevertheless, they have asserted that they are entitled to both continued receipt of their pension and a full distribution of their six-percent contributions and the town's twelve-percent contributions.

We discern no factual entitlement to the funds in the record developed by plaintiffs and conclude that the trial justice was clearly wrong when he found otherwise. We are persuaded that the trial justice overlooked and misconceived material evidence when he concluded that plaintiffs and the town had a deferred compensation plan pursuant to which plaintiffs were entitled to immediate distribution of the funds in addition to continued receipt of their pensions,

---

[5] Mr. Faella receives a reduced disability pension following resolution of a dispute regarding the town's decision to place him on disability retirement; in accordance with the settlement of that dispute, he receives a sixty-percent disability pension, rather than sixty-six and two-thirds percent.

particularly in light of the town's uncontroverted evidence that plaintiffs were indeed contributing to a police pension fund.

Having had the opportunity to establish an entitlement, plaintiffs failed to meet their evidentiary burden to do so. The plaintiffs' evidence—recited throughout this opinion—did not establish the factual substance of any agreement between plaintiffs and the town to treat the parties' six-percent and twelve-percent contributions as deferred compensation. The only remaining evidence was that plaintiffs contributed six percent of their paychecks to a pension fund as part of the applicable CBAs with the town.

The plaintiffs assert that the town conceded that the ING agreement constituted, as a matter of federal law, an I.R.C. § 457 "plan" based on the town's statement in its papers before this Court that "[o]n or about April 26, 1984, the Town established the Town of Johnston Deferred Compensation Plan with Aetna Life [I]nsurance and Annuity Company[.]" (Emphasis omitted.) This assertion takes the town's argument out of context and elevates semantics over substance.

An examination of the town's brief before this Court as a whole and in the context of the trial proceedings makes clear that defendants were referring to the title of the ING agreement, which, as elucidated previously, was labeled as a deferred compensation plan. However, since the genesis of the present cases, the town has disputed that there was ever an agreement between the town and plaintiffs to defer

- 19 -

compensation or that plaintiffs had any other entitlement to the funds separate and apart from their pensions.

We observe that the only other basis for relief articulated by plaintiffs is their assertion that I.R.C. § 457 entitles them to distribution as a matter of law; plaintiffs urge this Court to accept that provision as determinative of their right to the funds. We decline plaintiffs' invitation to rely on § 457—a provision of the Internal Revenue Code contained in Subtitle A, Income Taxes; Chapter 1, Normal Taxes and Surtaxes; Subchapter E, Accounting Periods and Methods of Accounting; Part II, Methods of Accounting; Subpart B, Taxable Year for Which Items of Gross Income Included—as establishing a property right, particularly in the absence of any citation to regulations or caselaw that supports their assertion. Because of our previously articulated conclusion that plaintiffs failed to establish as a factual matter that they had an agreement with the town to defer compensation, we need not reach the issue of the effects of I.R.C. § 457. However, we do not pass on the propriety of the town's actions relative to the various federal laws pertaining to retirement plans and taxation; rather, we limit our opinion to the issue of the trial justice's factual conclusion that the town and plaintiffs agreed to defer compensation pursuant to 26 U.S.C. § 457.

Having concluded that there was no sufficient factual or legal basis for doing so, we hold that the trial justice abused his discretion by granting the plaintiffs'

request for declaratory judgment based on the ING agreement between the town and ING.

## Conclusion

For the foregoing reasons, we reverse the judgment of the Superior Court and remand the cases to the Superior Court for entry of final judgment consistent with this opinion.

Justice Lynch Prata did not participate.

## STATE OF RHODE ISLAND

## SUPREME COURT – CLERK'S OFFICE
Licht Judicial Complex
250 Benefit Street
Providence, RI  02903



## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | Albert A. Faella et al. v. Town of Johnston et al. <br><br> Alan Ross v. Town of Johnston. |
| **Case Number** | No. 2019-445-Appeal. <br> (PB 10-311) <br><br> No. 2019-447-Appeal. <br> (PB 10-60) |
| **Date Opinion Filed** | May 25, 2022 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, and Long, JJ. |
| **Written By** | Associate Justice Melissa A. Long |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Michael A. Silverstein |
| **Attorney(s) on Appeal** | For Plaintiffs: <br><br> Michael J. Lepizzera, Esq <br> Timothy J. Robenhymer, Esq. |
| | For Defendants: <br><br> William J. Conley, Esq. |